<u>**NOT FOR PUBLICATION**</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| ALAN SPIEGEL, *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>GOLDIN AUCTIONS, LLC, *et al.*,<br><br>        Defendants. | HONORABLE KAREN M. WILLIAMS<br><br>Civil Action<br><br>No. 23-1202 (KMW-EAP)<br><br>**MEMORANDUM OPINION**[1] |

| | |
|---|---|
| **William Wendell Cheney, III, Esquire**<br>Freeman Mathis & Gary, LLP<br>3 Executive Campus<br>Suite 350<br>Cherry Hill, NJ 08002<br><br>*Counsel for Plaintiffs Alan Spiegel and Steven Spiegel* | **Edward J. Henry, Esquire**<br>Deasey, Mahoney & Valentini, LTD<br>923 Haddonfield Road<br>Suite 300<br>Cherry Hill, NJ 08002<br><br>*Counsel for Defendants Goldin Auctions, LLC and Kenneth Goldin* |

**WILLIAMS, District Judge:**

**I.   INTRODUCTION**

    Before the Court is Defendants Goldin Auctions, LLC ("Goldin LLC") and Kenneth Goldin's ("Mr. Goldin") (collectively, the "Defendants") Motion to Dismiss Plaintiffs Alan Spiegel and Steven Spiegel's ("Mr. Spiegel") (collectively, the "Plaintiffs") Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Oral argument on Defendants' Motion was held on Friday, November 17, 2023, at 3:00 p.m. For the reasons that follow, Defendants' Motion to Dismiss is denied.

---

[1] This Memorandum Opinion clarifies the Court's ruling on Defendants Goldin Auctions, LLC and Kenneth Goldin's Motion to Dismiss Plaintiffs Alan Spiegel and Steven Spiegel's Complaint, which it previously announced on the record following oral argument on November 17, 2023.

## II.  BACKGROUND

Plaintiffs are collectors of high-end trading cards and participate in the market as secondary market resellers. Compl. ¶¶ 32, 33. Goldin LLC is an auction house that sells trading cards, collectibles, and memorabilia. *Id.* ¶ 34. Mr. Goldin is the founder and an owner of Goldin LLC. *Id.* ¶ 39. In January 2014, Plaintiffs purchased a "2003-04 Upper Deck Exquisite Collection Lebron James Rookie Jersey Patch Autograph" card bearing serial number 44/99 (the "Card"). *Id.* ¶ 56; *see also* Image 1, *infra*. The Card contained a "patch," which is a swatch of material, often from a player-worn jersey, placed inside of a window in a card that makes the material viewable in the card design. Compl. ¶¶ 27, 57, 60. Before Plaintiffs purchased the Card, it had been authenticated and graded by Beckett Grading Service ("Beckett"), a company that determines whether a card is genuine or fake, and grades the condition of the card based on several factors, including the conditions of its surface, edges, and corners, as well as the quality of the centering of the images. *Id.* ¶¶ 26, 40, 58. As for the Card at issue in this case, Beckett assigned it an overall grade of "9," along with various sub-grades, all of which are printed on the Card's plastic covering or "card slab." *Id.* ¶ 58; *see also* Image 2, *infra*.



**Image 1**



**Image 2**

In October 2019, after holding onto the card for several years, Plaintiffs decided to test the market value of the Card and listed it for sale as a secondary seller on eBay. Compl. ¶¶ 59, 81, 82. After listing the Card, Plaintiffs received an online message from a customer concerning the patch displayed in the Card's patch window. *Id.* ¶ 60. The message included an image of a card that was similar to the one Plaintiffs listed. However, the customer's image displayed a patch that was white, as opposed to the multi-color patch displayed in Plaintiffs' listing. *Id.* ¶ 61; *see also* Image 3, *infra*.



**Image 3**

Following this comparison, various individuals and businesses took to social media and began posting side-by-side images of the two cards. Compl. ¶¶ 50–54, 82–89, 93–96; *see also* Image 4, *infra*. One such comparison was made on social media by "Cardporn," an entity that is generally regarded as a trustworthy source of information concerning authenticity in the trading card industry. Compl. ¶ 52. The postings about the Card made the controversy more public among those who collect sports memorabilia. *Id.* ¶¶ 93–96; Pls.' Br. at 2.



**Image 4**

This was the first time Plaintiffs had seen a purported image of the Card with a patch that was different from what was displayed in the card they purchased. Compl. ¶ 61. Nonetheless, the different patch raised speculation that Plaintiffs' card was altered and not authentic. *Id*. ¶ 89; Pls.' Br. at 1. The controversy surrounding the Card's authenticity led Plaintiffs to reach out to the Card's manufacturer, Upper Deck ("Upper Deck"), to determine whether the Card had its patch replaced at any time by someone other than Upper Deck. Compl. ¶ 63. If the patch had been replaced by anyone other than the Card's manufacturer, the Card would not be considered authentic, and its value would suffer as a result. *Id*. ¶ 64.

By letter dated October 16, 2019, Upper Deck manager Chris Carlin ("Mr. Carlin") verified the authenticity of the Card, stating that "[a]fter careful examination of the 2003-04 Exquisite Collection Basketball Jersey Autograph Card #78 (crash numbered 44/99) of LeBron James we came to the conclusion the card is authentic" (the "October 2019 Verification Letter"). *Id*. ¶¶ 66–

69; *see also* Compl. Ex. A. The October 2019 Verification Letter, however, did not offer a conclusion as to the authenticity of the patch embedded within the Card. Compl. Ex. A.

Thereafter, Plaintiffs presented the letter and the Card to Beckett so that the Card could be re-holstered. Compl. ¶ 70. The Card was subsequently put into a new card slab, which included the same grade markings, and also included the words "Patch Authenticated." *Id.* ¶ 72; *see also* Image 5, *supra*.



**Image 5**

In spring 2021, Goldin LLC approached Plaintiffs about selling the Card during a time when the sports trading card market hit an all-time high. Compl. ¶ 107. Goldin LLC believed selling the Card "would break records" because it was graded so highly and was accompanied by a letter from the manufacturer supporting its authenticity. *Id.* Mr. Spiegel and Mr. Goldin subsequently entered into a consignment agreement on June 4, 2021 (the "Consignment Agreement"), whereby Mr. Spiegel agreed to consign the Card to Goldin LLC "to be offered for public sale at auction." Defs.' Br. Ex. B, at 2. The parties also agreed to the following terms:

5

- "[Goldin LLC] will be solely responsible for determining final lotting and for describing of all items . . . . [Goldin LLC] will be sole determinant of the items valuation."

- Mr. Spiegel would "provide as much information as possible regarding consigned items including provenance, COA's[2] and any specific details which may be included in the description of those items. [Mr. Spiegel] expressly authorizes [Goldin LLC] to rescind the sale of any lot for any reason, including but not limited to, if it is learned that the lot may not be authentic or may be forgery or counterfeit."

- Mr. Spiegel "agrees to indemnify and hold harmless [Goldin LLC] for any reason regarding any claim and/or rescission concerning [his] lot. This includes all legal fees incurred by [Goldin LLC]. This warranty and indemnification will survive the completion of the transaction(s) described in this agreement."

- Goldin LLC "shall solely determine the appropriate auction and dates to list consignor's consignment merchandise. [Mr. Spiegel] understands that the initial acceptance of the consignment merchandise is not a guarantee of placement in [Goldin LLC's] auctions if the merchandise does not meet the minimum value threshold solely determined by [Goldin LLC], or its standards."

- "This Agreement shall be governed by and construed in accordance with the internal laws of the State of New Jersey . . . ."

*Id*. ¶¶ 3, 4, 5, 10, 21.

This same day, the parties also signed a second agreement attached as an addendum to the Consignment Agreement (the "Advance Agreement"), wherein the parties agreed that Mr. Spiegel would be issued "$400,000 as an advance against future proceeds due under the [C]onsignment [A]greement." Defs.' Br. Ex. C, ¶ 2. The Advance Agreement also stated, in relevant part, that Goldin LLC "will not issue an advance without proper authentication. [Goldin LLC] will determine if the authentication paperwork sent in with the item(s) meets its criteria." *Id.* ¶ 6.

---

[2] Defendants state "COA" is an acronym for "Certificate of Authenticity." Defs.' Br. at 3 n.5.

Prior to executing these agreements, Mr. Goldin had allegedly expressed to Plaintiffs his familiarity with the controversy surrounding the Card and stated that Goldin LLC "had no concerns as to its authenticity." Compl. ¶ 112. Nevertheless, questions regarding the Card's authenticity persisted after Goldin LLC agreed to sell the Card. *Id*. ¶ 113. On June 9, 2021, Mr. Goldin and Plaintiffs exchanged text messages about the Card's authenticity, with Mr. Goldin sending Plaintiffs side-by-side images of the Card and an image of the card with the white patch. *Id*. ¶ 114. In response, Plaintiffs provided Mr. Goldin with the October 2019 Verification Letter from Upper Deck. *Id*. ¶ 115. Mr. Goldin also contacted Upper Deck directly to verify that the October 2019 Verification Letter had been issued by Upper Deck and confirm that it had not been altered in any way. *Id*. ¶ 116; *see also* Defs.' Br. at 6. Upper Deck confirmed with Mr. Goldin that it had issued the October 2019 Verification Letter and that it was not altered. Compl. ¶ 117.

With these assurances, Mr. Goldin moved forward and the auction for the Card ultimately went live on June 10, 2021. *Id*. ¶ 124; Defs.' Br. at 6. Within twenty-four hours, bids for the card had risen to $690,000. Compl. ¶ 124. However, when the auction listing first went live, Mr. Spiegel's name was included in the listing. *Id*. ¶ 125. According to Plaintiffs, this was problematic because Goldin LLC's policy "was to keep seller information confidential unless the seller directed otherwise." *Id*. ¶ 119. During the auction, Mr. Goldin acknowledged in a text message that Mr. Spiegel's name "was up for few mins," though confirmed that his name was eventually removed from the listing. *Id.* ¶ 125. Plaintiffs maintain that the public was not aware that they were the owners of the Card prior to Mr. Goldin's oversight.[3] *Id*. ¶ 126.

---

[3] Plaintiffs appear to allege that because Mr. Spiegel was identified as the owner of the Card, they have been subject to harassment and accusations that they altered the Card, were dishonest, and should not be trusted. Compl. ¶ 127.

7

On June 11, 2021, Goldin LLC halted the sale and removed the Card from auction. *Id.* ¶ 128. Defendants maintain that during a later telephone call with Mr. Goldin, Mr. Carlin from Upper Deck had actually retracted his findings contained in the October 2019 Verification Letter. *Id.* ¶ 131; Defs.' Br. at 6. Mr. Goldin called Plaintiffs to inform them as much prior to cancelling the auction, during which time he also stated that he was "facing too much pressure from Cardporn and its followers," and was withdrawing the Card because Cardporn had convinced Upper Deck to retract its verification. *Id.* ¶ 130–31.

The same day the Card was removed from the auction, Mr. Goldin posted the following on his Instagram account:

> Today I made the decision to withdraw Lot 2, which was a LeBron James Exquisite RPA. What had made that card so unique was the intricate patch and the fact it came with a letter authenticating the patch from Upper Deck. I had a conversation and email exchange with Upper Deck yesterday and they were 100% confident in everything written in their 2019 letter verifying the authenticity of the patch. Today I had another conversation with them and they did not express the same level of confidence. For that reason, I decided to pull the card from our June Premium Auction. I did not take this decision lightly nor does it mean that the patch is not authentic. However, based on the information available to me, I determined that the card did not meet the standards and requirements to appear within a Goldin Auction to uphold our reputation as the most trusted marketplace for collectibles. @goldinauctions. Thanks to @cardcollector291 for digging up a key photo I needed and to @cardporn for all their behind the scenes work throughout this process from the time the preview hit to when we pulled the card.

*Id.* ¶ 136.

To date, Plaintiffs have not been able to sell the Card and they allege the reason is "based on the perceived legitimacy that [Mr. Goldin's] statements lend to the conspiracy theory that [the Card] was surgically altered." *Id.* ¶ 179. To this end, Plaintiffs bring the instant action against Mr. Goldin and Goldin LLC, and assert claims for breach of fiduciary duty (Count I); tortious interference with prospective economic advantage (Count II); fraud in the inducement (Count III);

8

breach of the implied covenant of good faith and fair dealing (Count IV); as well as for violations of the New Jersey Consumer Fraud Act (the "CFA") (Count V). Compl. at 31, 34, 36, 39, 41.[4]

### III. LEGAL STANDARD

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is required to accept as true all factual allegations in the complaint and draw all reasonable inferences from those allegations in the light most favorable to the plaintiff, *see Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008), but need not accept as true legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). A complaint need not contain "detailed factual allegations" to survive a motion to dismiss, but must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint "that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" and a complaint will not "suffice" if it provides only "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 555, 557 (2007)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Determining whether the allegations in a complaint are 'plausible' is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Young v. Speziale*, No. 07-03129, 2009 WL 3806296, at *3 (D.N.J. Nov. 10, 2009) (quoting *Iqbal*, 556 U.S. at 679). A complaint that provides facts "merely

---

[4] Counts III and IV are asserted only against Goldin LLC.

9

consistent with" the defendant's liability "stops short of the line between possibility and plausibility" and will not survive review under Rule 12(b)(6). *Id.* (quoting *Iqbal*, 556 U.S. at 678).

When claiming fraud, Federal Rule of Civil Procedure 9(b) requires the plaintiff to allege the "essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where, and how' of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276–77 (3d Cir. 2006) (quoting *In re Rockefeller Ctr. Prop. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)). This heightened pleading standard applies to common law fraud claims and claims for violations of the CFA. *See Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 524 (D.N.J. 2008) (applying Rule 9(b) to CFA and common law fraud claims).

## IV.   DISCUSSION

### A.   Counts I–III: Breach of Fiduciary Duty, Tortious Interference with Prospective Economic Advantage, and Fraud in the Inducement

In their Complaint, Plaintiffs assert that Defendants (1) breached a fiduciary duty owed to Plaintiffs and their interests in the Card (Count I); (2) intentionally interfered with their interests in the Card's sale (Count II); and (3) that Defendants withdrawal of the Card from auction, despite their prior representations, betrayed their intent to represent Plaintiffs' interest (Count III). In their Motion, Defendants argue that Plaintiffs' claims for breach of fiduciary duty, tortious interference of prospective economic advantage, and fraud in the inducement are barred by the economic loss doctrine because they arise out of the parties' respective rights and duties under the Consignment Agreement.

The economic loss doctrine "precludes tort claims where the allegedly tortious conduct is intrinsic to the contract—i.e., where the alleged tort consists of the breach of a contractual

promise." *CPS MedManagement LLC v. Bergen Reg'l Med. Ctr., L.P.*, 940 F. Supp. 2d 141, 159 (D.N.J. 2013). In deciding whether the economic loss doctrine applies, the Court focuses on "whether the plaintiff's entitlement to economic losses flows directly from obligations set forth in a contract." *State Cap. Title & Abstract Co. v. Pappas Bus. Servs., LLC*, 646 F. Supp. 2d 668, 678 (D.N.J. 2009) (applying economic loss doctrine where plaintiff failed to identify how allegations were extrinsic to the underlying agreement). However, the doctrine does not apply when a party uses misrepresentations to induce another into entering an agreement. *See Red Hawk Fire & Sec., LLC v. Siemens Indus. Inc.*, 449 F. Supp. 3d 449, 465 (D.N.J. 2020); *see also G&F Graphic Servs., Inc. v. Graphic Innovators, Inc.*, 18 F. Supp. 3d 583, 585 (D.N.J. 2014) (finding economic loss doctrine did not apply to fraudulent inducement claim where defendant's alleged misrepresentation induced purchase); *Wilhelm Reuss GmbH & Co KG, Lebensmittel Werk v. E. Coast Warehouse & Distrib. Corp.*, No. 16-4370, 2018 WL 3122332, at *1 (D.N.J. June 26, 2018) (finding economic loss doctrine did not bar tort claim where defendant's misrepresentation regarding insurance coverage allegedly induced plaintiff to enter contract).

In the instant Motion, Defendants submit that Plaintiffs' tort-based claims implicate the parties' Consignment Agreement and are consequently precluded by the economic loss doctrine. As a threshold matter, the Court notes that the Consignment Agreement—though not initially attached to the Complaint—is nevertheless properly before the Court because the allegations acknowledge its existence and rely on its terms. For example, Plaintiffs allege the following:

- "[Goldin LLC] [ ] expressly agreed to provide an immediate advance against the anticipated proceeds of [the Card] a week before the auction of the card started. ([Goldin LLC] never paid that advance.)"

- "Some of those questions [related to the authenticity of the Card] persisted after the parties agreed [Goldin LLC] would sell the card but before the auction went live."

11

- "[The Plaintiffs] demanded that [Mr. Goldin] not include their name in the listing as [Goldin LLC's] policy was to keep seller information confidential unless the seller directed otherwise."

- [Goldin LLC's] failure to provide any advance against [the Card] despite an agreement to do so further suggests that [Goldin LLC] never intended to complete the auction of [the Card].

Compl. ¶¶ 111, 113, 119, 177.

These examples make clear that Plaintiffs rely on the Consignment Agreement in the Complaint. However, notwithstanding these references, Plaintiffs contend that Defendants' alleged conduct supporting their claims do not relate to or arise out of the Consignment Agreement. Specifically, Plaintiffs submit that the conduct at issue occurred either before the Consignment Agreement was executed or after it had terminated. On the other hand, Defendants argue that these three claims are barred by the economic loss doctrine because they are intrinsic to the Consignment Agreement and unable to be separated from the parties' duties and obligations pursuant to the agreement.

Having thoroughly reviewed the Complaint, the Court is unable to conclude at this juncture that Plaintiffs' claims arise out of the Consignment Agreement. The parties' arguments confirm that any consideration of the economic loss doctrine will necessarily entail a fact-intensive inquiry focused on evidence—materials that are naturally absent at the pleadings stage. Notwithstanding this deferral, the Court finds that Plaintiffs have satisfied the heightened pleading standard and have successfully made out claims for breach of fiduciary duty, tortious interference with

prospective economic advantage, and fraud in the inducement. Accordingly, Defendants' Motion to Dismiss Counts I through III is denied.[5]

### B. Count IV: Breach of the Implied Duty of Good Faith and Fair Dealing

In the alternative to Plaintiffs' claim for fraud in the inducement, Count IV of the Complaint asserts a claim for breach of the implied covenant of good faith and fair dealing. In their Motion, Defendants argue that Goldin LLC was within its contractual rights to undertake any efforts it wished to determine whether the Card, and the patch embedded in the card, was authentic.[6]

Under New Jersey law, all contracts are deemed to contain an implied covenant of good faith and fair dealing. *Fields v. Thompson Printing Co., Inc.*, 363 F.3d 259, 270 (3d Cir. 2004); *Wade v. Kessler Inst.*, 172 N.J. 327, 340 (2002). A claim for breach of that covenant "arises when the other party has acted consistent with the contract's literal terms, but has done so in such a manner so as to 'have the effect of destroying or injuring the right of the other party to receive the fruits of the contract[.]'" *Wade*, 172 N.J. at 345 (quoting *Bak-A-Lum Corp. of Am. v. Alcoa Bldg. Prods., Inc.*, 69 N.J. 123, 129 (1976)). A complaint alleging a breach of an implied covenant must allege more than a simple breach of the terms of the contract. *See Durr Mech. Constr., Inc. v. PSEG Fossil, LLC*, 516 F. Supp. 3d 407, 417 (D.N.J. 2021).

Here, Plaintiffs' allegations extend beyond simply stating that Defendants violated a contract term. Indeed, Plaintiffs cite three examples of unfair dealing and two instances of bad faith. For example, Plaintiffs allege that Goldin LLC engaged in unfair dealing when it, through

---

[5] To be clear, nothing in this ruling neither prohibits Defendants from affirmatively defending against Plaintiffs' claims based on the economic loss doctrine, nor precludes them from raising this defense at the summary judgment stage.

[6] As the parties agreed that New Jersey law governs the Consignment Agreement, the Court analyzes this claim under New Jersey law. Defs.' Br. Ex. B, ¶ 21.

13

Mr. Goldin, engaged in private conversations with other sources, including Cardporn, looking for information to call the Card into question without revealing the nature of those discussions to Plaintiffs. Compl. ¶ 243. Plaintiffs also allege Goldin LLC acted in bad faith by making public statements that questioned the trustworthiness of the Card and by seeking to obtain positive publicity among the card collecting world at the expense of Plaintiffs. *Id*. ¶¶ 246, 247. Therefore, according to Plaintiffs, they suffered damages in the loss of value of the Card. *Id*. ¶ 251. Thus, Plaintiffs have sufficiently alleged that Defendants' conduct encompassed not only literal violations of the contractual terms, but also bad faith conduct intended to impact the value of the Card. For these reasons, the Motion to Dismiss Count IV is denied.

### C. Count V: Violations of the CFA[7]

In Count V of the Complaint, Plaintiffs allege that Defendants violated the CFA when they "represented that they were experts in evaluating and marketing for sale sports trading cards and other sports memorabilia," causing an "identifiable loss by the Plaintiffs in the loss of the value of [the Card] and the suffering of reputational damage by the Plaintiffs." Compl. ¶¶ 266, 269. Defendants argue that these allegations are insufficient to demonstrate that Mr. Goldin engaged in any "unlawful conduct."

"To state a prima facie case under the CFA, a plaintiff must establish three elements: (1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's unlawful conduct and the plaintiff's ascertainable loss." *Payan v. GreenPoint Mortg. Funding*, 681 F. Supp. 2d. 564, 572 (D.N.J. 2010). Rule 9(b)'s

---

[7] Plaintiffs list their CFA claim as the fourth count in their Complaint. The Court notes Plaintiffs' CFA claim is the fifth count in their Complaint and, for ease of reference, will reference it as such.

heightened standard for pleading fraud applies to a CFA claim that sounds in fraud. *See Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). The CFA defines "unlawful conduct" as:

> [t]he act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise. . . .

N.J. Stat. Ann. § 56:8-2. Courts have grouped these proscribed forms of conduct into one of three general categories: affirmative acts, knowing omissions, or violations of regulations promulgated under the CFA. *See Dzielak v. Whirlpool Corp.*, 26 F. Supp. 3d 304, 333 (D.N.J. 2014). In any case, the "prime ingredient" underlying any claim is the "capacity to mislead." *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 17 (1994); *see also Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 296 (D.N.J. 2009).

In the Complaint, Plaintiffs allege misrepresentation on the part of Goldin LLC to complete the sale of the Card. Compl. ¶ 234. Plaintiffs further allege that Goldin LLC intended that Plaintiffs rely on the misrepresentation to enter into an agreement, whereby Goldin LLC would market and sell the Card. *Id*. ¶ 235. The Court finds that Plaintiffs have sufficiently pled the first element of a CFA claim.

An ascertainable loss under the CFA "occurs when a consumer receives less than what was promised." *Union Ink Co., Inc. v. AT&T Corp.*, 801 A.2d 361, 379 (N.J. Ct. App. Div. 2002). This element is satisfied when a plaintiff alleges that he or she has received a product worth objectively less than what she reasonably expected. *Dzielak*, 26 F. Supp. 3d at 335. In the Complaint, Plaintiffs allege that their "identifiable loss" is the loss of the value of the Card and reputational damage to Plaintiffs. Compl. ¶ 269. The Court finds that Plaintiffs have adequately pled the second element of a CFA claim.

Finally, the third element of a CFA claim requires "that a causal relationship be established between any ascertainable loss and the unlawful practice condemned." *Ramanadham v. N.J. Mfrs. Ins. Co.*, 455 A.2d 1134, 1136 (N.J. Ct. App. Div. 1982). In the Complaint, Plaintiffs adequately allege the third element of a CFA claim. They allege the unlawful conduct "caused an identifiable loss by the Plaintiffs in the loss of the value of [the Card] and the suffering of reputational damage." Compl. ¶ 269. This language sufficiently alleges at the pleading stage a causal nexus between the ascertainable loss and the unlawful conduct. *See Volin v. General Electric Co.*, 189 F. Supp. 3d 411, 419 (D.N.J. 2016).

Accordingly, Plaintiffs sufficiently plead a CFA claim. The Motion to Dismiss Count V is denied.

## V.   CONCLUSION

For the reasons explained above, Defendants' Motion to Dismiss Plaintiffs' Complaint is denied.


Date: November 21, 2023

                                               */s/ Karen M. Williams*
                                               KAREN M. WILLIAMS
                                               United States District Judge