<u>**NOT FOR PUBLICATION**</u>

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

|  |  |
|---|---|
| STEVEN SPIEGEL and ALAN SPIEGEL,<br><br>*Plaintiffs,*<br><br>v.<br><br>GOLDIN AUCTIONS, LLC and KENNETH GOLDIN, *et al.*,<br><br>*Defendants.* | HONORABLE KAREN M. WILLIAMS<br><br>Civil Action<br><br>No. 23-1202-KMW-EAP<br><br>**OPINION** |

<u>APPEARANCES</u>:

WILLIAM WENDELL CHENEY, III, ESQ.
**FREEMAN MATHIS & GARY, LLP**
3 EXECUTIVE CAMPUS
SUITE 350
CHERRY HILL, NJ 08002

TRAVIS A. KNOBBE, ESQ.
**TK LAW, LLC**
410 PEACHTREE PARKWAY, STE. 4245
CUMMING, GA 30041

*Counsel for Plaintiffs*

READE WILLIAM SELIGMANN, ESQ.
JONATHAN D. PARENTE, ESQ.
ANDREW A. ROBERTS, ESQ.
**ALSTON & BIRD LLP**
90 PARK AVENUE
NEW YORK, NY 10016

*Counsel for Defendants*

**WILLIAMS, District Judge:**

## I.    INTRODUCTION

Presently before the Court are three motions arising from a dispute concerning a highly publicized 2003–04 Upper Deck Exquisite Collection ("Upper Deck") LeBron James Rookie Patch Autograph card bearing serial number 44/99 (the "Card"). (Defs.' Statement of Undisputed Material Facts ("Defs.' SUMF") ¶¶ 11–17, Dkt. No. 121-2.) Specifically, before the Court are: (1) Defendants Goldin Auctions, LLC and Kenneth Goldin's ("Defendants") Motion for Summary Judgment ("MSJ") (Dkt. No. 121); (2) Defendants' Motion for Partial Summary Judgment on Defendants' breach-of-contract counterclaim (Dkt. No. 122); and (3) Plaintiffs Steven Spiegel and Alan Spiegel's ("Plaintiffs") Motion for Partial Summary Judgment on certain affirmative claims (Dkt. No. 123). The motions are fully briefed and the Court has reviewed the extensive factual record submitted by the parties, including deposition testimony, text messages, emails, social-media postings, auction materials, and authentication-related communications involving Upper Deck representatives.

This case arises from a breakdown in the parties' relationship after Defendants withdrew the Card from a planned June 2021 auction following escalating public controversy concerning the authenticity of the patch embedded in the Card. (Defs.' SUMF ¶¶ 31–34; Pls.' Resp. to Defs.' SUMF ("Pls.' RUMF") ¶¶ 31–34, 102–15, Dkt. No. 130-1.) Plaintiffs contend Defendants improperly withdrew the Card in bad faith after publicly promoting and defending it for months, thereby destroying the Card's market value and damaging Plaintiffs' reputations. (Pls.' SUMF ¶¶ 26-27, 31, 51, Dkt. No. 123-1.)

Defendants, by contrast, contend Plaintiffs knowingly failed to disclose material information concerning longstanding authenticity concerns surrounding the Card and

2

misrepresented the scope and meaning of an Upper Deck authentication letter upon which Defendants relied in agreeing to auction the Card. (Defs.' SUMF ¶¶ 20-60, 88-91.)

Although the parties frame the dispute in sharply different terms, the Court concludes that the evidentiary record presents numerous disputed issues of material fact unsuitable for resolution as a matter of law. Central factual disputes remain concerning, among other things: what Upper Deck and its representatives knew regarding the Card and the so-called "white patch" controversy; what Plaintiffs disclosed to Defendants before consignment; what Defendants reasonably understood the Upper Deck authentication letter to mean; whether Defendants acted reasonably and in good faith in withdrawing the Card; and whether either side materially misrepresented or omitted information concerning the Card's authenticity history.

For the reasons set forth below, the motions will be denied.

## II.   BACKGROUND

### a.  The Card and the Upper Deck Replacement Process

The Card at issue is a 2003–04 Upper Deck Exquisite Collection LeBron James Rookie Patch Autograph card serial-numbered 44/99. (Defs.' SUMF ¶¶ 11–17.) The Card belongs to a class of highly sought-after sports collectibles commonly referred to within the hobby as "RPAs," or rookie patch autographs. (*Id.*, ¶¶ 11-14.) Such cards typically contain an embedded jersey patch and player autograph and may command extraordinarily high prices depending upon rarity, condition, provenance, and perceived authenticity. (*Id.*)

The parties do not dispute that at some point after the Card's original manufacture, the original card associated with serial number 44/99 was destroyed and replaced through Upper Deck's customer-service replacement process. (*Id.*, ¶¶ 4, 127; Pls.' RUMF ¶¶ 127-28; Declaration of Steven Spiegel in Support of Plaintiffs' MSJ ("Spiegel Mot. Decl.") ¶ 14, Dkt. No. 123-4.) Nor

do the parties dispute that Upper Deck ultimately issued a written letter concerning the Card in October 2019. (Pls.' SUMF ¶¶ 8-10, 15; Defs.' RUMF ¶ 8-9.) The dispute instead concerns what exactly Upper Deck authenticated, what Upper Deck knew regarding controversy surrounding the Card, and whether subsequent communications materially altered the significance of the original authentication letter. (*See* Defs.' RUMF ¶¶ 10, 15; Pls.' RUMF ¶¶ 39-40, 44-46.)

The record reflects that controversy surrounding the Card existed before Defendants accepted the Card for auction. (Defs.' SUMF ¶¶ 20–34.) Hobby collectors and online commentators had circulated images allegedly depicting an earlier version of the Card containing a different, predominantly white jersey patch. (*Id.*, ¶¶ 23-30.) Some collectors asserted that the Card's patch may have been replaced after issuance, while others disputed the reliability and provenance of the circulated image itself. (*Id.*, ¶¶ 26, 28-30.)

Plaintiff Steven Spiegel testified that he became aware of the controversy and sought clarification from Upper Deck in October 2019. (Declaration of Steven Spiegel in Opposition to Defendants' MSJ ("Spiegel Opp. Decl.") ¶¶ 3–11, Dkt. No. 130-3.) On October 16, 2019, Spiegel emailed Upper Deck's quality assurance department and specifically asked whether the Card retained "the original patch this card was printed with." (Pls.' Opp., Ex. B – Oct. 16, 2019 Email Chain, Dkt. No. 130-4.) Upper Deck employee Chris Carlin responded later that day, acknowledging that Upper Deck had already seen the Card "pop up on social media as some fans cried foul." (*Id.*, Ex. C, Dkt. No. 130-5.) Carlin nevertheless invited Spiegel to Upper Deck headquarters and subsequently provided a written authentication letter. (Spiegel Opp. Decl. ¶ 8.)

The October 16, 2019 letter ("Upper Deck Letter") stated, in relevant part, that Upper Deck had researched its records concerning the Card and concluded that "the card is authentic," that the original card had been destroyed, and that the replacement card was issued with serial number

4

44/99. (Defs.' MSJ, Ex. 7, Dkt. No. 121-10.) Plaintiffs contend the letter confirmed the legitimacy of the Card itself, including the patch embedded within it. (Spiegel Mot. Decl., ¶¶ 14-19.) Plaintiffs further emphasize that Upper Deck issued the letter despite already knowing about the online controversy and images circulating within the hobby. (*Id.*)

Defendants, however, contend the letter merely confirmed that Upper Deck had reissued a replacement card associated with serial number 44/99 and did not specifically authenticate the patch embedded in the replacement Card. (Defs.' RUMF ¶¶ 10, 15.) Defendants rely heavily on later testimony from Carlin in which he stated that he could not independently "validate" the patch itself and that he later developed concerns regarding questions that could arise if the Card were resold. (Deposition of Chris Carlin ("Carlin Dep.") 95:19-23, 139:20-22, Dkt. No. 121-9.)

### b.  Plaintiffs' Acquisition and Marketing of the Card

The record reflects that Plaintiffs acquired the Card through a series of transactions involving sophisticated collectors and hobby participants. Steven Spiegel, in particular, appears extensively involved in high-end sports card transactions and negotiations.

Following receipt of the Upper Deck letter, Plaintiffs promoted the Card within the hobby and communicated with prospective buyers and auction houses concerning the Card's significance. (Pls.' SUMF ¶¶ 18, 20; Spiegel Mot. Decl. ¶¶ 22, 24-26.) Plaintiffs repeatedly characterized the Card as uniquely authenticated by Upper Deck and emphasized the rarity of possessing an Upper Deck letter associated with the Card. (Pls.' SUMF ¶¶ 9-15, 86; Spiegel Mot. Decl. ¶ 22.) Some communications described the Card as the "only one authenticated by Upper Deck" or referred to the patch as "authenticated by [U]pper [D]eck." (Defs.' MSJ, Ex. 14, Dkt. No. 121-17; Ex. 22, Dkt. No. 121-25.) Defendants contend these statements materially overstated what Upper Deck actually confirmed. (Defs.' RUMF ¶¶ 10, 15.)

At the same time, Plaintiffs maintain that they reasonably understood the Upper Deck letter to authenticate the Card as it existed in 2019, particularly because Upper Deck issued the letter after reviewing the controversy and images circulating online. (Spiegel Opp. Decl. ¶¶ 24-26; Pls.' SUMF ¶ 15.) The record further reflects that despite continuing hobby debate concerning the Card, Plaintiffs received substantial expressions of interest and discussed potential sales involving seven-figure valuations. (Defs.' MSJ, Ex. 14; Ex. 21, Dkt. No. 121-24; Ex. 22.)

### c. Defendants' Consignment Discussions and Auction Preparations

In early 2021, Plaintiffs entered discussions with Defendants concerning consigning the Card for auction through Goldin Auctions. (Defs.' SUMF ¶¶ 86-97, 103.) The Card was expected to serve as a marquee item in Defendants' June 2021 auction. (*Id.*, 110, 113.) The parties executed a Consignment Agreement that included provisions concerning authenticity-related disputes, Defendants' authority to withdraw items from auction, and Plaintiffs' obligations to provide information regarding consigned items. (Consignment Agreement, Dkt. No. 121-27.) The Agreement required Plaintiffs to provide "as much information as possible" concerning the Card, including provenance, certificates of authenticity, and related details. (*Id.* § 4.) The record reflects that Defendants invested substantial resources promoting the Card. (Defs.' SUMF ¶¶ 110-15, 122-25.) Defendants retained public-relations firms, created social-media campaigns, prepared auction materials, and publicly defended the legitimacy of the Card and the Upper Deck letter. (*Id.*)

Ken Goldin personally communicated with Plaintiffs and others regarding the controversy. (Pls.' Opp., Exs. E-F – Text Messages, Dkt. Nos. 130-7, 130-8.) In text messages and social-media postings, Goldin repeatedly defended the authenticity letter and stated that he intended to "stand by Upper Deck and their letter" unless proven otherwise. (Pls.' Opp., Ex. E, Dkt. No. 130-7.)

Goldin also publicly responded to critics on hobby forums and social media, explaining that Defendants had independently contacted Upper Deck regarding the authenticity letter and had conducted extensive diligence. (Pls.' SUMF ¶¶ 24-31; Defs.' SUMF ¶¶ 119-23.)

At the same time, however, the controversy surrounding the Card intensified publicly in the weeks leading up to the scheduled auction. (Defs.' SUMF ¶¶ 29; Pls.' Opp., Ex. E; Spiegel Mot. Decl., ¶ 30 (citing Pls.' MSJ, Ex. 13, Dkt. No. 123-5 at 23-30.) Hobby commentators, social-media accounts, and collectors continued debating the significance of the allegedly earlier white-patch image and questioning whether the patch embedded in the Card had been altered.

### d.   The June 2021 Withdrawal

In June 2021, shortly before the auction, Defendants withdrew the Card. (Defs.' SUMF ¶¶ 136-38.) The precise reasons for the withdrawal are highly contested between the parties.

Defendants contend the withdrawal occurred only after Chris Carlin materially backed away from the confidence reflected in the 2019 letter during a June 2021 telephone call. (Defs.' SUMF ¶ 137; Deposition of Ken Goldin ("Goldin Dep.") 24:2-23, Dkt. No. 121-33.) Defendants maintain that Carlin informed Goldin that he could not confirm the authenticity of the patch itself and that Defendants therefore could no longer responsibly rely upon the authentication letter. (Defs.' SUMF ¶¶ 134-38; Goldin Dep. 24:19-23.)

Plaintiffs dispute Defendants' characterization of the call and emphasize that no written retraction of the Upper Deck letter was ever issued. (Pls.' RUMF ¶ 134; Spiegel Opp. Decl. ¶ 26.) Plaintiffs further contend Defendants exaggerated the significance of Carlin's statements after public controversy surrounding the Card escalated. (Pls.' RUMF ¶¶ 13438.)

Following the withdrawal, Goldin publicly announced that the Card had been removed from auction because it did not satisfy Defendants' standards and requirements for inclusion in the

7

auction. (Defs.' MSJ, Exs. 37-38 – Public Statements, Dkt. Nos. 121-40, 121-41.) At the same time, Goldin also publicly stated that withdrawal did "not mean the patch is not authentic," but instead reflected reduced confidence from Upper Deck concerning the Card. (*Id.*) The parties agree that the withdrawal generated substantial publicity within the hobby.

Plaintiffs contend Defendants' conduct destroyed the Card's market value, damaged Plaintiffs' reputations, and improperly fueled authenticity accusations unsupported by definitive evidence. (Pls.' SUMF ¶¶ 26-27, 31, 51; Spiegel Mot. Decl. ¶¶ 62-63.) Defendants, by contrast, maintain they acted responsibly and in accordance with their contractual and commercial obligations after learning additional information concerning the Card and the controversy surrounding it. (Defs.' SUMF ¶¶ 37-44.)

### e.  Procedural History

Plaintiffs thereafter initiated this action asserting claims including breach of contract, breach of the implied covenant of good faith and fair dealing, and related tort-based theories arising from Defendants' withdrawal of the Card. (Compl., Dkt. No. 1.) Defendants asserted counterclaims including fraud, negligent misrepresentation, and breach of contract, alleging Plaintiffs failed to disclose material information concerning longstanding authenticity concerns and materially overstated the significance of the Upper Deck authentication letter. (Amended Answer and Counterclaims, Dkt. No. 96.) The parties now seek summary judgment on numerous claims and counterclaims. (*See* Dkt. Nos. 121-23.) The Court addresses the motions below.

## III.   LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact" and that the movant is therefore "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine where "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material where it "might affect the outcome of the suit under the governing law." *Id.*

In evaluating a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004). The Court may not weigh evidence, make credibility determinations, or resolve factual disputes. *Anderson*, 477 U.S. at 254-55; *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

Where, as here, the parties have filed cross-motions for summary judgment, the Court must consider each motion separately and construe all facts and inferences against the moving party for purposes of each motion. *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008). The filing of cross-motions does not itself establish the absence of disputed issues of material fact. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).

## IV.    DISCUSSION

### a.  Overview of the Core Factual Disputes

Before turning to the parties' individual claims and counterclaims, the Court first addresses several recurring factual disputes that permeate the record and materially affect nearly every cause of action presently before the Court.

Although the parties frequently frame this litigation as a binary dispute concerning whether the Card is "authentic" or "fraudulent," the summary judgment record reflects a substantially more nuanced commercial dispute involving disputed interpretations of the October 2019 Upper Deck letter, evolving understandings regarding the so-called "white patch" controversy, competing

9

accounts of the parties' disclosures and omissions, and divergent explanations for Defendants' withdrawal of the Card from auction.

Many of the parties' claims and counterclaims rise or fall not on isolated evidence, but on competing interpretations of the same communications, public statements, and course of dealing. Those recurring disputes bear directly upon the parties' contract claims, fraud theories, disclosure obligations, reliance arguments, implied-covenant theories, and damages contentions. Because resolution of those issues depends heavily upon witness credibility, competing reasonable inferences, and disputed factual context, the Court finds that summary judgment is inappropriate on the present record.

### i.   *The Meaning and Scope of the Upper Deck Letter*

The parties fundamentally dispute what the October 16, 2019 Upper Deck authentication letter actually established. Plaintiffs contend the letter authenticated the Card as it existed in 2019, including the embedded patch itself. (Pls.' SUMF ¶ 86.) Plaintiffs emphasize that Steven Spiegel expressly raised the "white patch" controversy with Upper Deck before the letter issued and specifically asked whether the Card retained "the original patch this card was printed with." (Pls.' Opp., Ex. B.) Plaintiffs further emphasize that Chris Carlin acknowledged Upper Deck had already seen the controversy "pop up on social media as some fans cried foul" before issuing the letter. (*Id.*, Ex. C.)

Defendants, by contrast, contend the letter merely confirmed that Upper Deck had reissued a replacement card associated with serial number 44/99 and did not specifically authenticate the embedded patch itself. (Defs.' RUMF ¶¶ 10, 15.) Defendants rely heavily upon Carlin's later testimony that he could not independently "validate" the patch and later developed concerns regarding questions that could arise if the Card were resold. (Carlin Dep. 95:19-23, 139:20-22.)

10

Viewing the record in the light most favorable to the nonmovant on each motion, the Court concludes that substantial evidence supports both interpretations. The letter itself broadly states that Upper Deck researched its records and concluded that "the card is authentic." (Defs.' MSJ, Ex. 7.) The letter nowhere expressly limits its conclusions solely to the serial-number replacement process or expressly disclaims the embedded patch. (*See id.*) At the same time, Carlin later testified that his review focused principally upon replacement-card records and that he could not independently authenticate the patch itself. (Carlin Dep. 95:19-23, 139:20-22.)

The parties additionally introduced substantial evidence concerning how the letter was interpreted contemporaneously by Plaintiffs, Defendants, grading companies, and hobby participants. Plaintiffs repeatedly characterized the Card as uniquely authenticated by Upper Deck. (Pls.' SUMF ¶¶ 9-15, 86; Spiegel Mot. Decl. ¶ 22.) Yet Defendants themselves likewise publicly defended the Card and represented that they had independently confirmed the legitimacy of the letter with Upper Deck before the withdrawal occurred. (Defs.' SUMF ¶¶ 110-15, 122-25.)

On this record, the Court cannot determine as a matter of law whether the Upper Deck letter authenticated the Card in its entirety, merely confirmed the replacement-card process, or established something in between.

### ii. What Upper Deck Knew About the "White Patch" Controversy

The parties likewise dispute the extent to which Upper Deck understood the nature and significance of the authenticity controversy before issuing the October 2019 letter.

Plaintiffs introduced evidence showing that Steven Spiegel expressly disclosed the circulated white-patch image and related concerns before receiving the letter. (*See* Pls.' Opp., Exs. B-D.) Plaintiffs further emphasize Carlin's acknowledgment that Upper Deck had already seen the controversy online before issuing the letter. (*Id.*, Ex. B.) Defendants, however, contend Upper

11

Deck did not fully appreciate the significance of the controversy until later and rely upon Carlin's subsequent testimony indicating that his concerns evolved over time. (Carlin Dep. 95:19-23, 139:20-22.)

The record additionally contains competing evidence regarding the reliability of the allegedly earlier white-patch image itself. Plaintiffs characterize the image as unsourced, potentially manipulated, and lacking verified provenance. (Pls.' RUMF ¶¶ 29-30; Spiegel Opp. Decl. ¶ 3.) Plaintiffs further point to evidence that Carlin himself questioned whether the image may have been digitally altered. (Defs.' MSJ, Ex. 9; Spiegel Opp. Decl. ¶¶ 19-21.) Defendants, by contrast, introduced evidence demonstrating longstanding hobby skepticism regarding the image and the Card dating back years before the Goldin auction. (Defs.' SUMF ¶¶ 20-34; Defs.' MSJ, Ex. 12.)

These disputes bear directly upon the parties' fraud theories, disclosure obligations, reliance arguments, and good-faith defenses. More fundamentally, they underscore that the record does not permit the Court to reduce this matter to a binary determination concerning authenticity at the summary judgment stage.

### iii. *Whether Plaintiffs Materially Concealed Information*

Defendants' fraud and breach-of-contract theories depend substantially upon the contention that Plaintiffs failed to disclose material information concerning the controversy surrounding the Card. The parties do not appear to dispute that Plaintiffs did not initially provide Defendants with the complete chain of post-letter communications involving Carlin and subsequent discussions concerning resale concerns and the circulated white-patch image. (Defs.' Requests for Admission, ¶ 3, Dkt. No. 121-14.) Defendants characterize those omissions as materially misleading because the omitted communications referenced unresolved controversy and concerns regarding future resale of the Card. (Defs.' Mot. for Partial Summary Judgment ("MPSJ") at 2, Dkt. No. 122-1.)

12

Plaintiffs, however, dispute both the significance and materiality of the omitted communications. Plaintiffs emphasize that Carlin nevertheless continued stating that he remained "in the camp that this card is legit" while discussing the controversy. (Pls.' MPSJ Opp. Br. at 5, Dkt. No. 128; *see* Defs.' MSJ, Ex. 10, Dkt. No. 121-13.) Plaintiffs further contend Defendants themselves were fully aware of the controversy before withdrawing the Card and nevertheless continued publicly defending and marketing it. (Pls.' MPSJ Opp. Br. at 6 (citing Ex. F).)

Whether Plaintiffs materially concealed information, whether any omissions were intentionally misleading, and whether Defendants reasonably relied upon allegedly incomplete disclosures all present disputed factual questions unsuitable for resolution as a matter of law.

### iv.  Whether Defendants Reasonably Withdrew the Card

The parties also dispute whether Defendants acted reasonably and in good faith when withdrawing the Card from auction. Defendants contend they withdrew the Card only after Carlin materially retreated from the confidence reflected in the October 2019 letter during a June 2021 telephone conversation. (Defs.' SUMF ¶¶ 134-44.) Defendants rely heavily upon Ken Goldin's testimony that Carlin effectively "retracted" the letter and stated he could not confirm the authenticity of the patch itself. (*Id.* ¶¶ 134-38; Goldin Dep. 24:19-23.)

Plaintiffs dispute that characterization and emphasize that no written retraction of the letter was ever issued. (Pls.' RUMF ¶ 134; Spiegel Opp. Decl. ¶ 26.) Plaintiffs additionally introduced substantial evidence that Defendants publicly defended the Card for months, relied upon the Upper Deck letter themselves, and repeatedly stated they intended to "stand by Upper Deck and their letter." (Pls.' Opp., Ex. E.) The record additionally contains substantial evidence that escalating public controversy and social-media scrutiny surrounded the Card immediately before the withdrawal. (*See* Defs.' SUMF ¶¶ 116-28; Pls.' RUMF ¶¶ 116-28.)

13

Viewing the evidence in the light most favorable to the nonmovant on each motion, a reasonable jury could conclude either that Defendants acted responsibly after confidence in the Card materially deteriorated or that Defendants reacted opportunistically to mounting public pressure after previously promoting and defending the Card aggressively.

### v. Credibility Disputes Precluding Broad Summary Judgment Relief

Finally, the Court finds that the significant credibility disputes here further preclude summary judgment. Carlin's testimony occupies a central role throughout the litigation, yet the parties vigorously dispute the consistency and reliability of his recollections concerning the scope of the Upper Deck letter, the nature of his investigation, the significance of the white-patch controversy, and the substance of his communications with both Plaintiffs and Defendants. Likewise, disputes concerning Steven Spiegel's disclosures, understanding of the Upper Deck letter, and intent permeate the record. The same is true regarding Ken Goldin's evolving understanding of the Card and the reasons underlying Defendants' withdrawal decision.

The Court will not resolve those credibility disputes on summary judgment. *See Anderson*, 477 U.S. at 255. Nor will the Court determine which competing interpretation of the parties' communications and conduct is ultimately more persuasive. Those determinations are properly reserved for the factfinder.

### b. Plaintiffs' Claims
#### i. Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiffs assert Defendants breached the implied covenant of good faith and fair dealing. Under New Jersey law, every contract contains an implied covenant that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 420 (1997). A party may breach the implied covenant even while exercising express contractual rights where that

14

discretion is exercised arbitrarily, unreasonably, or in bad faith. *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 244 (2001). Whether Defendants exercised their contractual discretion in good faith presents fact-intensive issues generally unsuitable for summary adjudication on this record.

Plaintiffs introduced evidence from which a reasonable jury could conclude that Defendants fully understood the controversy surrounding the Card, nevertheless elected to capitalize upon the Card's publicity value, and withdrew the Card only after public pressure intensified. Plaintiffs rely particularly upon evidence that Defendants repeatedly assured Plaintiffs they intended to "stand by Upper Deck and their letter" and actively attempted to manage criticism surrounding the Card before the withdrawal occurred. (Pls.' Opp., Ex. E.)

Defendants, however, introduced evidence supporting the conclusion that the withdrawal reflected legitimate commercial and reputational concerns rather than bad faith. (*See* Defs.' SUMF ¶¶ 116-28.) Defendants additionally emphasize that no reasonable auction house could proceed with a highly publicized sale once substantial authenticity concerns emerged and confidence in the underlying authentication materially deteriorated. (*See id.*)

The Court cannot determine as a matter of law whether Defendants exercised their contractual discretion reasonably and in good faith. The record supports conflicting conclusions concerning Defendants' motivations and conduct, and resolution of those disputes necessarily depends upon credibility determinations reserved for the factfinder.

Accordingly, both motions will be denied as to Plaintiffs' implied-covenant claim.

### ii. Tort and Statutory Claims

The parties additionally seek summary judgment on various tort-based and statutory theories arising from the same nucleus of facts discussed above, including claims sounding in fraud, interference, negligence, breach of fiduciary duty, and consumer fraud.

15

The Court recognizes substantial questions concerning the precise boundaries between the parties' contract-based theories and their overlapping tort theories. Defendants, for example, contend certain negligence-based claims are barred by the economic loss doctrine because the parties' relationship is governed principally by the Consignment Agreement. (*See* Defs.' MSJ Br. at 13-14.)

At the same time, however, the present record does not permit clean separation of the parties' contractual and extra-contractual theories at summary judgment. *See Saltiel v. GSI Consultants, Inc.*, 170 N.J. 297, 311 (2002) (holding relationships can be established that "conceivably sound in both tort and contract, such as the relationship between physician and patient," and noting that "[p]rofessionals such as lawyers and accountants also have been found liable under both tort and contract theories for economic losses sustained due to negligent misrepresentations made while contractual services were being performed.") (citing W. Page Keeton, *et al.*, *Prosser & Keeton on the Law of Torts,* § 92, at 655 (5th ed. 1984) (*Prosser & Keeton*) ("The distinction between tort and contract liability, as between parties to a contract, has become an increasingly difficult distinction to make.")). Here, the claims at issue arise from overlapping allegations concerning disclosures, representations, commercial duties, reliance, auction-related conduct, and alleged misrepresentations occurring both before and after execution of the Consignment Agreement.

Similarly, although the Court recognizes substantial questions concerning the applicability of the New Jersey Consumer Fraud Act to a highly specialized commercial transaction involving sophisticated parties and a unique collectible asset, the parties' statutory theories substantially overlap with the same disputed factual issues permeating the remainder of the litigation, including alleged misrepresentations, omissions, reliance, and commercial reasonableness.

16

The Court nevertheless concludes that the present record does not permit categorical exclusion of the NJCFA theories as a matter of law. The parties vigorously dispute the extent to which the challenged conduct involved representations directed toward the broader marketplace, the commercial reasonableness of the parties' conduct, and whether the alleged misrepresentations and omissions transcended the parties' private contractual relationship. Those issues remain intertwined with unresolved factual disputes concerning reliance, disclosure, and the meaning reasonably attributed to the parties' public and private statements.

On the present record, viewing the evidence in the light most favorable to the nonmovants, the Court concludes that categorical dismissal of the parties' overlapping tort and statutory theories would be premature. The Court therefore declines to dispose broadly of those claims at summary judgment. The Court likewise declines at this stage to determine whether any particular tort theory may ultimately merge with or be limited by the parties' contract remedies following factual development at trial.

### c. Defendants' Counterclaims
#### i. Fraud and Fraudulent Inducement

Defendants contend Plaintiffs knowingly concealed material information concerning longstanding authenticity concerns surrounding the Card and materially overstated the significance of the Upper Deck letter. Under New Jersey law, common-law fraud requires proof of "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 172-73 (2005) (quoting *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997)).

Defendants introduced substantial evidence supporting their theory that Plaintiffs knew the Card had long been associated with controversy concerning the allegedly earlier white-patch

17

image, understood that the controversy specifically concerned alleged patch replacement, and nevertheless publicly characterized the Card as uniquely authenticated by Upper Deck. (*See* Pls.' SUMF ¶¶ 9-15, 86; Spiegel Mot. Decl. ¶ 22; Defs.' RUMF ¶¶ 10, 15.) Defendants additionally introduced evidence showing Plaintiffs failed initially to disclose the complete chain of communications involving Carlin, including later discussions concerning resale concerns and the circulated image. (Defs.' Requests for Admission, ¶ 3.) That evidence is sufficient to create triable issues concerning materiality and disclosure.

At the same time, Plaintiffs introduced substantial evidence undermining Defendants' attempt to establish fraud as a matter of law. Most significantly, Plaintiffs introduced evidence showing that Steven Spiegel directly disclosed the controversy to Upper Deck before receiving the October 2019 letter and expressly asked whether the Card retained "the original patch this card was printed with." (Pls.' Opp., Ex. B.) Plaintiffs further introduced evidence showing that Carlin acknowledged awareness of the controversy before issuing the letter. (*Id.*) Plaintiffs additionally introduced evidence suggesting Defendants themselves fully understood the controversy, publicly defended the Card, relied heavily upon the Upper Deck letter, and continued marketing the Card despite awareness of hobby criticism. (Pls.' Opp., Ex. E.)

Critically, the Court cannot conclude on this record that controversy alone establishes fraud as a matter of law. The distinction between a controversial collectible and a knowingly fraudulent one lies at the center of the parties' dispute, and resolution of that issue depends heavily upon credibility determinations, competing inferences, and disputed interpretations of the same underlying communications. The Court therefore cannot determine as a matter of law whether Plaintiffs knowingly concealed material information, whether any omissions were materially

misleading, whether Defendants reasonably relied upon allegedly incomplete disclosures, or whether either side materially overstated the significance of the Upper Deck letter.

Accordingly, both motions will be denied as to Defendants' fraud-based counterclaims.

### ii.   Negligent Misrepresentation and Related Counterclaims

Defendants' negligent-misrepresentation and related counterclaims fare similarly. Under New Jersey law, negligent misrepresentation requires proof of an incorrect statement negligently made and justifiably relied upon. *Kaufman v. i-Stat Corp.*, 165 N.J. 94, 109 (2000). For substantially the same reasons discussed above, disputed factual issues remain concerning the accuracy of Plaintiffs' representations, the significance of the omitted communications, the reasonableness of Defendants' reliance, and the parties' competing understandings of the Upper Deck letter.

The Court likewise declines to dispose categorically of Defendants' related statutory and quasi-tort counterclaims at this stage. Although certain of those theories may ultimately overlap substantially with Defendants' fraud and contract claims, the present record does not permit sufficiently precise delineation among the parties' competing factual theories to justify broad dismissal at summary judgment.

### iii.   Breach of Contract Counterclaim

Defendants additionally contend Plaintiffs breached the Consignment Agreement by failing to provide "as much information as possible" concerning the Card. (Consignment Agreement § 4.) Defendants rely heavily upon Plaintiffs' admitted failure initially to provide the complete post-letter communications involving Carlin and subsequent discussions concerning resale concerns and the circulated white-patch image. (Defs.' Requests for Admission, ¶ 3.) Plaintiffs do not meaningfully dispute that those communications were not initially produced. Plaintiffs instead dispute whether the omitted information was materially adverse or misleading.

19

The omitted communications contain language supporting both sides' narratives. On the one hand, Carlin referenced unresolved questions concerning resale and the circulated image. (Pls.' Opp., Ex. B.) On the other hand, Carlin simultaneously stated that he remained "in the camp that this card is legit." (Defs.' MSJ, Ex. 10.) Viewing the record in the light most favorable to each nonmovant, a reasonable jury could conclude either that Plaintiffs materially failed to disclose information Defendants reasonably would have considered important or that the omitted communications remained consistent with Plaintiffs' broader understanding that Upper Deck continued treating the Card as legitimate. Because disputed factual questions remain regarding materiality, breach, reliance, causation, and the parties' respective understandings of the disputed communications, summary judgment is inappropriate.

### d.  The Court Cannot Resolve Authenticity as a Matter of Law

Throughout the briefing, the parties repeatedly invite the Court to determine whether the Card is definitively authentic or fraudulent. The Court declines to do so. At summary judgment, the Court's role is not to determine which competing factual narrative is ultimately correct, but rather to determine whether genuine disputes of material fact remain for trial. *See Anderson*, 477 U.S. at 249.

Here, Plaintiffs introduced substantial evidence supporting authenticity, including the October 2019 Upper Deck letter, Carlin's contemporaneous investigation, and the absence of definitive forensic proof establishing alteration. Defendants, meanwhile, introduced substantial evidence supporting skepticism concerning the Card, including longstanding hobby controversy, the circulated white-patch image, evolving concerns expressed by Carlin, and evidence showing the controversy persisted even after issuance of the Upper Deck letter.

20

The Court cannot weigh those competing factual narratives, assess witness credibility, or determine which interpretation of the disputed evidence is more persuasive. Nor can the Court conclusively resolve expert-like disputes concerning hobby practices, replacement-card procedures, or the reliability of the circulated image. Importantly, even Defendants' own public statements repeatedly stopped short of definitively declaring the Card fraudulent. Instead, Defendants framed the issue as involving declining confidence, unresolved authenticity concerns, and withdrawal based upon Defendants' standards and requirements. The Court further concludes that it need not conclusively determine the ultimate authenticity of the Card to resolve the pending motions. The central question at summary judgment is not whether one side's interpretation of the evidence is ultimately correct, but whether the present record permits only one reasonable conclusion as a matter of law. It does not.

Accordingly, the ultimate authenticity of the Card remains a disputed factual issue reserved for the factfinder.

## V.    CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (Dkt. No. 121); Defendants' Motion for Partial Summary Judgment (Dkt. No. 122); and Plaintiffs' Motion for Summary Judgment (Dkt. No. 123) are **DENIED**. The Court expresses no view regarding the ultimate authenticity of the Card, which remains a disputed factual issue reserved for the factfinder. The parties' remaining claims and counterclaims shall proceed consistent with this Opinion.

An Order consistent with this Opinion accompanies.

Dated:  May 29, 2026

KAREN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

21